Argued October 10, 1967, reversed and remanded January 31, 1968, petition for rehearing denied February 27, 1968

CASCADIA LUMBER COMPANY, *Respondent,*
*v.* STOUT, *Appellant.*

437 P. 2d 111

*Karl T. Huston,* Corvallis, argued the cause for appellant. With him on the briefs was Fred McHenry, Corvallis.

*Dan W. Poling,* Newport, argued the cause for respondent. With him on the brief was James H. Lewelling, Newport.

Before McAllister, Presiding Justice, and O'Connell and Holman, Justices.

O'CONNELL, J.

This is an action of trespass for cutting timber on plaintiff's land. Defendant Claude Stout appeals from a judgment for plaintiff. Double damages were awarded under ORS 105.815.[1]

Defendant Stout sold all of the merchantable timber on land owned by him to defendant Flansberg at $10.00 per thousand board feet, payment to be made as the timber was cut. Plaintiff's land abutted Stout's land on the north. Flansberg cut timber not only on Stout's land but also on plaintiff's land north of the boundary line between plaintiff's and Stout's land. The trespass resulted from Flansberg's failure to ascertain the true line marking Stout's north boundary.

Plaintiff contends that Stout is liable under the principle announced in *Gordon Creek Tree Farms, Inc. v. Layne et al,* 230 Or 204, 358 P2d 1062, 368 P2d 737 (1962). In that case we held that an owner of timber who employs an independent contractor to cut timber on the owner's land but who fails to ascertain

---

[1] ORS 105.815 provides:

"If, upon the trial of an action included in ORS 105.810, it appears that the trespass was casual or involuntary, or that the defendant had probable cause to believe that the land on which the trespass was committed was his own or the land of the person in whose service or by whose direction the act was done, or that the tree or timber was taken from uninclosed woodland for the purpose of repairing any public highway or bridge upon the land or adjoining it, judgment shall be given for double damages."

the true boundary line and inform the independent contractor of its location is liable to an adjoining owner in trespass. The decision was based upon the principle that although an employer is not ordinarily liable for the acts of an independent contractor employed by him, this immunity from liability is not extended to an employer "who orders work to be performed from which, in the natural course of things, injurious consequences must be expected to arise unless means are adopted by which such consequences may be prevented."[9] (230 Or at 220, 368 P2d at 740.)

Plaintiff's argument proceeds upon the assumption that this principle, which recognizes the liability of an employer for the acts of an independent contractor, is equally applicable to a seller and imposes upon him liability for the acts of the buyer if injurious consequences are likely to follow unless means are adopted to prevent them.

Plaintiff's assumption is unsound. After a sale of real property, the seller is not responsible for the buyer's conduct in trespassing upon his neighbor's land unless in some manner the seller participated in the intrusion.

There would be sufficient participation to make the seller of timber a trespasser if he represented to his purchaser that the boundary line pointed out to the

---

[9] This principle is stated in Restatement (Second) of Torts § 413 (1965), as follows:

"One who employs an independent contractor to do work which the employer should recognize as likely to create, during its progress, a peculiar unreasonable risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the absence of such precautions if the employer

"(a) fails to provide in the contract that the contractor shall take such precautions, or

"(b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions."

purchaser was the true boundary line and that the purchaser could cut timber up to that line.[9] However, the seller is not a trespasser if he does not purport to designate the boundary line, it being understood that the purchaser himself is to locate the line.

Stout testified that he informed Flansberg that he did not know where the north boundary line was located. This, of course, is not controlling if there is evidence that Stout purported to designate the line up to which Flansberg could cut the timber. The only other evidence relating to the designation of the boundary was the testimony of Flansberg. His testimony is so confusing that it is impossible to determine precisely what part Stout played in the determination of the boundary line. Stout, Flansberg, and Duane Dixon went onto Stout's property for the purpose of locating the boundaries of Stout's property. Dixon was on the property at the request of Flansberg, presumably employed by Flansberg to help him locate the lines. Stout showed Flansberg generally where the southwest and southeast corners of his property were located. Flansberg testified that Stout "showed me where they was supposed to have been, to one on across a creek there was supposed to be a post or a blazed and up— the other would be up what is supposed to be a steel rod which the county covered up or somebody covered up with dirt." No effort was made by Stout, Flansberg or Dixon to locate the southwest and southeast corner markers. The following testimony describes their next step as they moved north along Stout's west line:

"Q. *  *  *  Now, what did he [Stout] tell

[9] Oswalt v. Smith, 97 Ala 627, 12 So 604 (1893); Hutto v. Kremer, 222 Miss 374, 76 So2d 204 (1954); Hambright v. Walker, 211 So C 201, 44 SE2d 310 (1947).

you, or if he told you anything in relation to where his boundaries went from there?

"A. Well, they went up the hill here at the forks.

"Q. And, did he estimate how far they went up the hill?

"A. We took 10 acres, 660 feet or 666 feet or whatever the exact feet are, we did run into a tree here. * * * We went up past here and we found a tree that was notched, I think it was a hemlock. "* * * * *

"Q. * * * [A]nd didn't he at that time tell you that his property ran about 666 feet up the hill?

"A. That is about right. He showed me the direction.

"Q. Yes. And, didn't he tell you at that time too that you would have to be the one to determine where his north line was?

"A. Us —

"Q. Because he didn't know where it was up there and you would have to determine that from those corners, didn't he tell you that?

"A. I don't know if he did or not. He told me where the line was, we went up the hill and we ran them lines with Dixon.

"Q. Who ran the lines?

"A. Me and Stout and Dixon.

"Q. You mean Stout was up there running the lines with you?

"A. We walked up over the hill.

"Q. Well, you wouldn't say he didn't tell you that his north line was about 666 feet north of these two points that he pointed out to you, would you?

"A. Say that again.

"Q. I say you wouldn't deny that he told you, Mr. Stout told you that his north line was 666 feet or around that number north of those two points that he—corners that he pointed out to you?

"A. No."

Flansberg then testified that when they reached a notched tree they turned to the right and followed blazed trees as they proceeded in an easterly direction. When he was asked if in this maneuver they had turned at right angles and proceeded in a straight line, he said, "I don't know what angle that was on, you would have to ask Duane Dixon," thus indicating that Dixon (who had brought a compass with him) rather than Stout was relied upon in establishing the course the line was to take. Other testimony by Flansberg relating to the north line was as follows:

"Q. Did you lay out any bearings yourself as far as the establishing a north line of Mr. Stout's property?

"A. No, it was pretty well notched through there. I figured I didn't know who notched that, I don't believe Claude did.

"Q. But, there were a row of notched trees?

"A. Yes, it was blazed all the way down through there.

"Q. That line was pointed out to you by Mr. Stout as being his north line?

"A. Well, no. We found that east line going that way.

"Q. You found that there?

"A. That we found this notched tree, we found this east line going that way.

"Q. And, that was you and Mr. Stout?

"A. Yes, and a Dixon, a Mr. Dixon too."

A careful examination of this testimony, as well as the other evidence in the case, reveals that although Stout participated with Flansberg and Dixon in attempting to determine where his boundary lines ran, there is no evidence whatsoever indicating that Stout represented that certain lines marked the periphery of his property and that Flansberg could safely rely upon

them in cutting the timber. Flansberg apparently relied upon the row of blazed trees as marking Stout's north boundary, but Flansberg recognized that Stout neither notched the trees himself nor knew who had done it. And when Flansberg was asked on direct examination if the line formed by the blazed trees "was pointed out to you by Mr. Stout as being his north line," he replied, "Well, no  *  *  *."

Plaintiff had the burden of proving that Stout was a trespasser. To carry this burden it was necessary for plaintiff to prove that Stout's participation in locating his boundary lines included an express or implicit representation by Stout that Flansberg could rely upon Stout's location of the lines. Plaintiff did not meet this burden of proof.

Since the trial court regarded *Gordon Creek Tree Farms, Inc. v. Layne et al, supra,* as controlling, it did not attempt to weigh the evidence upon the theory we hold is applicable. If the trial court had appraised the evidence, it would have been compelled to grant Stout's motion for a directed verdict.

The judgment is reversed and the cause is remanded to the trial court with directions to enter a judgment for defendant Claude Stout.